# IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT

# HILLSBOROUGH COUNTY, FLORIDA

| | |
|---|---|
| FARHAN F. KHAN, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR:** |
| vs. | **VIOLATIONS OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FDUTPA), SECTIONS 501.201-.213; UNJUST ENRICHMENT; NEGLIGENCE; AND CIVIL CONSPIRACY** |
| ANDA, INC., | |
| Defendant. | **JURY TRIAL DEMANDED** |

Ashley Keller*
ack@kellerlenkner.com
Travis Lenkner*
tdl@kellerlenkner.com
Seth Meyer*
sam@kellerlenkner.com
KELLER LENKNER LLC
150 N. Riverside Plaza, Suite 4270
Chicago, Illinois 60606
Tel: 312.506.5641

John A. Yanchunis
jyanchunis@ForThePeople.com
Juan Martinez
juanmartinez@ForThePeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Tel: 813.223.5505

William S. Consovoy*
will@consovoymccarthy.com
J. Michael Connolly*
mike@consovoymccarthy.com
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, Virginia 22209
Tel: 703.243.9423

James Young
jyoung@ForThePeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
76 S. Laura Street, Suite 1100
Jacksonville, Florida 32202
Tel: 904.398.2722

*Pro Hac Vice* admission to be sought

*Counsel for Plaintiff and the Putative Class*

CLASS ACTION COMPLAINT

Plaintiff Farhan F. Khan ("Plaintiff") brings this Class Action Complaint ("Complaint") , on behalf of himself and all others similarly situated, against Defendant Anda, Inc. ("Anda" or "Defendant"), seeking redress for Anda's illegal acts that have caused Plaintiff's and class members' health insurance premiums to increase. Plaintiff, for his Complaint, alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief:

## I.   **INTRODUCTION**

1.      Prescription opioids have devastated communities both across the country and in the State of Florida. Since 1999, there have been more than 183,000 reported opioid-related deaths nationwide—more than three times the number of U.S. soldiers who died in the Vietnam War. In addition to the tragic loss of life and the heartbreaking impact of these deaths on children and loved ones, some estimates state that the opioid crisis is costing governmental entities and private companies as much as $500 billion per year.

2.      Anda distributes prescription opioids, which are powerful, highly addictive narcotic painkillers.

3.      Anda could and should have prevented the brunt of the opioid epidemic, but instead allowed the country, including Florida, to be flooded with prescription opioids. Under federal law, distributors are required to secure and monitor drugs as they travel through commerce, to protect them from theft, and to reject and report suspicious or unusual orders by downstream pharmacies, doctors, or patients. But Anda neglected these duties, turning a blind eye to known or knowable problems in its own supply chains. By doing so, Anda created conditions in which vast amounts of opioids flowed freely from Anda to abusers and drug dealers—with Anda readily fulfilling suspicious orders from pharmacies and ignoring red flags that would require further investigation and resolution.

4.      This behavior by Anda has allowed massive amounts of opioids to be diverted from legitimate channels of distribution into the illicit black market, fueling the opioid epidemic. For years, Anda has had the ability to substantially reduce the death toll and adverse economic

consequences of opioid diversion but opted to pursue corporate revenues instead, creating an environment in which drug diversion could flourish.

5.      The explosion in opioid prescriptions and use has created a public health crisis in Florida. An oversupply of prescription opioids has provided a source for illicit use or sale of opioids, while their widespread use has created a population of addicted and dependent patients. When those patients can no longer afford or legitimately obtain opioids, they often turn to the street to buy prescription opioids or even heroin. In addition to the societal impact of deaths, overdoses, and rampant addiction, Anda's conduct has created higher demand and thus higher prices for opioids, as well as the need for expensive medical treatment for a number of covered health conditions, resulting in increased insurance costs for Florida residents.

6.      Anda's conduct has fueled skyrocketing opioid addiction, opioid-related deaths and emergency treatments, and has generated huge sales of opioids at inflated prices.

7.      The direct and proximate consequence of Anda's misconduct is that every Florida purchaser of private health insurance has paid higher premiums, co-payments, and deductibles. Insurance companies have considerable market power and pass onto their insureds the expected costs of future care—including opioid-related coverage. Accordingly, insurance companies factored in the unwarranted and exorbitant healthcare costs of opioid-related coverage caused by Anda and charged those costs back to insureds in the form of higher premiums, deductibles, and co-payments.

8.       This action seeks to hold Anda accountable for the economic harms it has imposed on Florida purchasers of private health insurance.

## II.    **PARTIES**

9.      Plaintiff Farhan F. Khan is a natural person, resident, and current citizen of the State of Florida.

10.     Defendant Anda, Inc. is a Florida corporation with its principal place of business located in Weston, Florida. Anda, Inc. is licensed to do business in the State of Florida and does substantial business in the State of Florida.

11.     At all relevant times, Anda promoted, marketed, advertised, distributed, and sold opioid products in the State of Florida and to Florida residents, citizens, and businesses.

12.     Plaintiff brings this class action against Anda, pursuant to Florida Rule of Civil Procedure 1.220, on behalf of:

> all current Florida citizens (including natural persons and entities) who purchased and paid premiums for health insurance policies in Florida governed by Florida law from 1996 through the present; and all current Florida citizens who paid for any portion of employer-provided health insurance in Florida governed by Florida law from 1996 through the present (the "Class").

Excluded from the Class is (1) any Judge presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current, former, purported, and alleged employees, officers, and directors; (3) counsel for Plaintiff and Defendant; (4) persons who properly execute and file a timely request for exclusion from the Class; (5) the legal representatives, successors, or assigns of any such excluded persons; and (6) all persons who have previously had claims similar to those alleged herein finally adjudicated or who have released their claims against Defendant. Also excluded from the Class are all individuals and entities who are not current Florida citizens or who were not Florida citizens at the time they purchased and paid premiums for health insurance policies in Florida governed by Florida law or paid for any portion of employer-provided health insurance in Florida governed by Florida law.

## III.    <u>JURISDICTION AND VENUE</u>

13.     This is an action for damages in excess of $15,000 exclusive of costs, interest, and attorneys' fees brought pursuant to Florida Rule of Civil Procedure 1.220.

14.     At all times material to this cause of action:

     a.     Greater than two-thirds of Plaintiff and the Class members in the aggregate

                        are citizens of the state of Florida;

      b.      Sole defendant Anda is a Florida corporation and otherwise deemed a citizen of this state;

      c.      The principal injuries, losses, or damages sustained by the Plaintiff and Class members as a result of the intentional and tortious conduct alleged herein were incurred in Florida; and

      d.      Two-thirds or more of Plaintiff, the Class members, and sole defendant Anda are citizens of the State of Florida.

15.     This Court has subject matter jurisdiction under Florida Statute § 501.201, *et seq.*, for violation of the Florida's Deceptive and Unfair Trade Practices Act, as well as the other remaining Florida law claims alleged herein.

16.     Venue is proper in this Court pursuant to Florida Statute § 47.051 because the practices complained of in this action are occurring and have occurred in the County of Hillsborough.

17.     The Complaint herein sets forth exclusively state law claims against Anda. Nowhere does Plaintiff plead, expressly or implicitly, any cause of action or request any remedy that arises under or is based on federal law. Plaintiff expressly asserts that the only causes of action asserted, and the only remedies sought herein, are founded upon the statutory, regulatory, common, and decisional laws of Florida.

18.     Additionally, federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 is not invoked by the Complaint, as it exclusively sets forth herein viable state law claims against Anda. The issues presented in the allegations of this Complaint do not implicate any substantial federal issues and do not turn on the necessary interpretation of federal law. No federal issue presented in the allegations of this Complaint is important to the federal system as a whole under the criteria set by the Supreme Court in *Gunn v. Minton*, 568 U.S. 251 (2013).

IV.     **FACTUAL ALLEGATIONS**

A.      **Anda Engaged in Unlawful and Unfair Misconduct.**

19.     Anda engaged in misconduct, including its knowing and reckless failure to prevent the rampant diversion of opioids.

B.      **Anda Had a Duty to Exercise Reasonable Care in Distributing Opioid Drugs.**

20.     Anda has duties under Florida common law—as well as federal laws—to exercise reasonable care and not to create a foreseeable risk of harm to others.

21.     Anda also is required to comply with the Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq*., and its implementing regulations, which govern the distribution and dispensing of controlled substances. Among other reasons, Congress passed the CSA to protect against "the widespread diversion of [controlled substances] out of legitimate channels into the illegal market." H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566, 4572.

22.     The CSA regulates the distribution of drugs from the manufacturing level through delivery to the patient. Opioid distributors are required to maintain effective controls against opioid diversion. They are also required to create and employ a system to identify and report suspicious orders of controlled substances to law enforcement authorities. Suspicious orders include orders of unusual size or frequency, or otherwise deviating substantially from normal patterns. To comply with these requirements, distributors must know their customers, report suspicious orders, conduct due diligence, and terminate orders if there are indications of diversion.

23.     To prevent unauthorized users from obtaining opioids, the CSA created a distribution monitoring system for controlled substances based on the registration and tracking requirements imposed on distributors of controlled substances. The Drug Enforcement Administration ("DEA") has created the Automation of Reports and Consolidation Orders System ("ARCOS"), an automated drug reporting system that monitors the flow of Schedule II controlled substances from their point of manufacture through commercial distribution channels to point of sale. ARCOS accumulates data on distributors' acquisition/distribution transactions,

which are then summarized into reports used by the DEA to identify any diversion of controlled substances into illicit channels of distribution. Everyone registered to distribute ARCOS reportable controlled substances is supposed to report acquisition and distribution transactions to the DEA.

24.     Acquisition and distribution transaction reports provide data on each acquisition to inventory, identifying whether it is, for example, by purchase, transfer, or return from a customer, and each reduction from inventory, identifying whether it is, for example, by sale, transfer, theft, destruction, or seizure by government agencies. *See* 21 U.S.C. § 827(d)(l); 21 C.F.R. §§ 1304.33(e), (d). Inventory that has been lost or stolen is also reported separately to the DEA within one business day of discovery.

25.     In addition to filing acquisition and distribution transaction reports, registrants are required to maintain complete and accurate records of each substance manufactured, imported, received, sold, delivered, exported, or otherwise disposed of. *See* 21 U.S.C. §§ 827(a)(3), 1304.2l (a), 1304.22(b). It is unlawful to fail to abide by these recordkeeping and reporting requirements.

26.     Distributors of controlled substances also are required to maintain effective controls against diversion of controlled substances into illegitimate medical, scientific or industrial channels. When determining if a distributor has provided effective controls, the DEA Administrator refers to the security requirements set forth in the regulations, which provide standards for the physical security controls and operating procedures necessary to prevent diversion. *See* 21 C.F.R. § 1301.71.

27.     Because Anda was already purporting to monitor and report on opioid transactions, its utter failure to take reasonable precautions to ensure the accuracy of its reports was an inexcusable breach of its common law duty.

C.     **Anda Knowingly or Negligently Facilitated Widespread Diversion of Opioids.**

28.     Opioid diversion has been a widely publicized problem for years. Numerous publications, studies, agencies, and professional organizations have highlighted the dangerous

rates of opioid abuse and overdose across the country and in Florida.

29.     To address the problem of opioid diversion, the DEA has provided guidance to distributors in the form of publications, agency actions, and other documents on the requirements of suspicious order reporting.

30.     For over a decade, the DEA has conducted one-on-one briefings with distributors regarding downstream customer sales and prudent due diligence steps. The DEA provided distributors with information on controlled substance distribution patterns and trends, including data on order volume, order frequency, and the ratio of controlled to non-controlled purchases. Distributors were also given case studies, legal findings against other registrants, and ARCOS profiles of their customers whose previous purchases may have reflected suspicious ordering patterns. The DEA highlighted "red flags" that distributors should look for in order to identify potential diversion. The DEA implemented this initiative to help distributors understand their duties with respect to diversion control.

31.     In addition, the DEA has hosted numerous conferences to provide registrants with updated information about diversion trends and regulatory changes affecting the drug supply chain, the distributor initiative, and suspicious order reporting. Anda attended these conferences, which also provided opportunities to ask questions and raise concerns.

32.     The DEA also participated in numerous meetings and events with the Healthcare Distribution Management Association ("HDMA"), which is now known as the Healthcare Distribution Alliance ("HDA")—an industry trade association for drug wholesalers and distributors, of which Anda is a member. DEA representatives have provided guidance concerning suspicious order monitoring to the HDA, which has published guidance documents for members on suspicious order monitoring, reporting requirements, and diversion of controlled substances.

33.     In addition, the DEA Office of Diversion Control sent letters dated September 27, 2006 and December 27, 2007 to all registered distributors providing guidance on suspicious order monitoring of controlled substances and the responsibilities of registrants to conduct due

diligence on customers for controlled substances.

34.     The September 27, 2006 letter reminded registrants that they are required by law to exercise due diligence to avoid filling orders that may be diverted into illicit markets. It explained that as part of the legal obligation to maintain effective controls against diversion, distributors are required to exercise due care in confirming the legitimacy of all orders prior to filling. It also described indicia of diversion, including orders of excessive quantities of a limited variety of controlled substances, disproportionate ratios of controlled substances to non-controlled prescription drugs, excessive quantities of a limited variety of controlled substances in combination with lifestyle drugs, and orders of the same controlled substance from multiple distributors. The letter went on to describe what questions should be answered by a customer when attempting to determine whether an order is suspicious.

35.     On December 27, 2007, the Office of Diversion Control sent a follow-up letter to DEA registrants providing guidance and reiterating their legal obligations. The letter reminded registrants that suspicious orders must be reported promptly and simply on monthly transaction reports. It also advised that registrants must perform independent analyses of suspicious orders prior to the sales to determine if diversion appears likely, and that filing suspicious order reports and then completing the sales does not absolve registrants from legal responsibility. Finally, the letter directed registrants to review a recent DEA action that addressed criteria in determining suspicious orders and the obligation to maintain effective controls against diversion.

36.     Anda was notified by its own industry group, the HDMA, of group-published industry compliance guidelines entitled "Reporting Suspicious Orders and Preventing Diversion of Controlled Substances," which emphasized the responsibilities of each member of the supply chain in distributing controlled substances. These industry guidelines further stated that, "[a]t the center of a sophisticated supply chain, distributors are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers."

37.     Anda has acknowledged the magnitude of the diversion problem and its legal responsibilities to prevent diversion, yet has knowingly or negligently allowed diversion. As a

result of its misconduct, Anda has paid civil fines and other penalties to state and federal regulators through a variety of mechanisms.

38.     For example, in May 2016, Anda entered into a settlement agreement with the State of West Virginia to settle claims that it had failed to maintain effective controls against diversion of controlled substances. Anda agreed to pay a $1,865,250 civil fine.

39.     Despite these and other penalties and settlements with law enforcement authorities over the past decade, Anda has continued to allow diversion of opioids to maximize its revenue.

**D.     Anda's Misconduct Facilitated the Opioid Epidemic.**

40.     Although Anda had the ability and duty to prevent opioid diversion, it continued to allow it, which enabled the opioid crisis to reach epidemic proportions.

41.     Anda has supplied huge quantities of prescription opioids in Florida with actual or constructive knowledge that the opioids were ultimately being consumed for non-medical purposes. Many of these shipments should have been stopped or investigated as suspicious orders, but Anda negligently or intentionally failed to do so.

42.     Anda knew or should have known that the volume of opioids it allowed to flow into Florida was far in excess of what could be consumed for medically-necessary purposes in the relevant communities.

43.     Anda negligently or intentionally failed to adequately control its supply lines to prevent diversion. A reasonably prudent distributor of Schedule II controlled substances would have protected against the danger of opioid diversion by: taking greater care in hiring, training, and supervising employees; providing greater oversight, security, and control of supply channels; more carefully scrutinizing the pharmacists and doctors who were purchasing large quantities of commonly abused opioids in amounts greater than the populations in those areas would warrant; investigating demographic factors concerning the increasing demand for narcotic painkillers in certain communities; proactively providing information to pharmacies and retailers about opioid diversion; and at a bare minimum, following applicable statutes, regulations, professional

standards, and guidance from government agencies.

44.    Anda made insufficient efforts to monitor or to perform due diligence to ensure that the controlled substances it had furnished were not being diverted to illegal uses.

45.    On information and belief, Anda compensated certain of its employees, at least in part, based on the volume of their sales of opioids, thus improperly creating incentives that contributed to opioid diversion and the resulting epidemic of opioid abuse.

46.    It was reasonably foreseeable to Anda that its conduct in flooding the market with highly-addictive opioids would allow opioids to fall into the hands of addicts, criminals, vulnerable populations, and other unintended users. It was also reasonably foreseeable to Anda that, when unintended users gained access to opioids, tragic preventable injuries would result, including addiction, overdose, and death in Florida.

47.    Anda knew or should have known that the opioids being diverted from its supply chains would contribute to the opioid epidemic and would create access to opioids by unauthorized users, which, in turn, would perpetuate the cycle of addiction, demand, and illegal transactions.

48.    Anda knew or should have known that a substantial number of the opioids distributed in and to Florida were being dispensed based on invalid or suspicious prescriptions. It was foreseeable that filling suspicious orders for opioids would cause harm to individual pharmacy customers, third parties, and the State of Florida.

49.    Anda was aware of widespread prescription opioid abuse throughout the country and in Florida, but it nevertheless persisted in a pattern of distributing commonly abused and diverted opioids in geographic areas and in such quantities, and with such frequency that it knew or should have known these commonly abused controlled substances were not being prescribed and consumed for legitimate medical purposes.

50.    The use of opioids by Florida citizens who were addicted or who did not have a medically-necessary purpose to use opioids could not have occurred without the knowing cooperation and assistance of Anda. If Anda had implemented and enforced effective controls to

guard against diversion, Florida and its citizens would have avoided significant injury.

51.     Anda made substantial profits from its distribution of opioids in Florida, including opioids that it knew or should have known were being diverted to improper channels.

**E.      Florida Purchasers of Health-Care Insurance Have Sustained Substantial Harm as a Result of Anda's Misconduct.**

52.     Health insurance is an individual or group policy that provides coverage for hospital, medical, surgical, and/or prescription drug benefits.

53.     Anda's misconduct has increased Plaintiff's cost of private health insurance in Florida.

54.     In 2014, Florida residents paid more than $160 billion for healthcare, of which almost $50 billion was spent on private health insurance. As is true throughout the country, healthcare costs in Florida are increasing at a rate far above core inflation. From 1991 to 2014, Floridians spent an average of 4.5% more per year on healthcare.

55.     Insurance premiums—the fees paid to get and keep insurance—have risen at an even more alarming clip. From 2002 to 2014, Florida enrollees in private health insurance have spent 5.8% more per year, increasing the total amount spent per person from $2,211 in 2001 to $4,606 in 2014. That is almost six times the rate of inflation.

56.     Many Florida employees obtain health insurance through an employer. Florida's providers of group healthcare insurance include: Aetna Life Insurance Company, All Savers Insurance Company, Blue Cross Blue Shield of Florida dba Florida Blue, Humana Health Insurance Company of Florida, and UnitedHealthcare Insurance Company.

57.     Other Floridians obtain individual health insurance. As elsewhere, Floridians typically buy individual health insurance when they do not have access to an employer plan and do not qualify for public health insurance like Medicaid or Medicare. Florida's providers of individual health insurance include: Blue Cross and Blue Shield of Florida dba Florida Blue, Celtic Insurance Company, Cigna Health and Life Insurance Company, and Freedom Life

Insurance Company of America.

58.     Group participants may pay all or part of the premium directly, or their employers may pay all or part of the premium directly. Individual purchasers (or members of their family) pay the entire premium directly. The "deductible" in a health-insurance plan is the amount the insured must pay each period (usually annually) before insurance starts to cover healthcare costs. A "co-payment" is a flat amount the insured pays per claim, such as a doctor visit or prescription. "Co-insurance" is the percentage of a bill that the insured pays under some plans after the deductible is met. Deductibles and co-payments often are higher under individual plans.

59.     As a direct and proximate result of the conduct described herein, natural and corporate persons have sustained losses and injuries in the form of higher premiums, deductibles, and co-payments/co-insurance. Healthcare insurers in Florida have paid (and expect to continue to pay) substantial amounts for opioid prescriptions that would never have been prescribed and/or filled absent Anda's misconduct, and have also paid (and expect to continue to pay) substantial amounts for treatment of individuals who became addicted to opioids and/or who became addicted to heroin or other drugs because of opioid use. Many of those individuals who became addicted to opioids—or who became addicted to heroin or other drugs because of opioid use—would never have become addicted or even received access to opioids absent Anda's conduct described herein. These insurers have also paid for numerous other costs proximately caused by Anda's conduct, including care for babies born addicted to opioids, emergency-room treatments, and other claims.

60.     Plaintiff purchasers of private health insurance have been damaged as a result of paying prices that are higher as a direct result of all Anda's misconduct. Florida health insurers are easily able to—and do—pass higher costs onto their insureds. Premiums in health-insurance markets do not reflect individual differences in costs, meaning that *all* insureds bear higher costs inflicted by the highest-risk insureds.

61.     In Florida, as in most other states, insurers charge premiums based on assigned rate classes, a pool of insured individuals with similar health status. Because the premium

charged is uniform for the entire risk class, excessive claims experienced by others raise premiums for everyone. This empirical reality makes economic sense. Insurers cannot know *ex ante* if an individual insured will take and become addicted to opioids, with the corresponding costs that ensue for that patient. So insurers charge every insured a higher premium—including the majority of insureds who never take opioids—to pay for the risk of future, opioid-related claims.

62.     This is partially because insured patients with opioid abuse or dependence diagnoses cost health insurers more than average patients, in Florida and nationwide. In 2015, total annual per-patient charges (the costs of providing a health service) and allowed amounts (the maximum an insurer will pay for a covered health service) for services for patients with opioid abuse and dependence diagnoses were 550% higher than for the average insured patient.

63.     Thus, as the opioid crisis has barreled forward across the country and in Florida, so has the pressure on insurance companies to raise premiums. Indeed, by one estimate, private insurance claims related to opioid dependence rose by an astonishing 3,200% nationwide from 2007 to 2014, and upon information and belief by a comparable percentage in Florida, with the brunt of this burden falling on those aged 19 to 35. This makes sense in light of the demonstrated increase in opioid-related emergency room visits and treatment center admissions, along with the growth in the percentage of privately insured Americans and Floridians over this period. Similarly, professional charges and allowed amounts grew by over 1,000% for patients diagnosed with opioid abuse or dependence from 2011 to 2015, further increasing insurance companies' incentive to increase their customers' rates.

64.     The costs that Anda's conduct inflicted on the insurance market cannot be and have not been confined to opioid users because of such risk pooling. Empirical evidence evaluated by leading economists confirms this common-sense conclusion. In addition, many of the costs that Anda has inflicted on the health system involve risks that insurers may not refuse to cover as a matter of law and regulation, since Florida is like "all states [that] have mandated certain benefits that must be included in the health insurance package of that state, most

commonly for substance abuse." Jonathan Gruber and Helen Levy, *The Evolution of Medical Spending Risk*, JOURNAL OF ECONOMIC PERSPECTIVES, 23(4), pp. 25-48, at 32 (2009).

**F.    Anda Acted Wantonly, Willfully, Outrageously, and with Reckless Disregard for the Consequences of Its Actions.**

65.    When engaging in the conduct described herein, Anda acted wantonly, willfully, outrageously, and with reckless disregard for the consequences of its actions.

66.    Anda knew and should have known about the harms that its unlawful and unfair business practices have caused and continue to cause in Florida. Anda knew of the risks and signs of diversion, and yet failed to take action that would have prevented or mitigated opioid diversion. Anda also had access to and carefully watched data collected by the government and other organizations that tracked the explosive rise in opioid use, addiction, injury, and death.

67.    At all relevant times, Anda knew that the likely consequences of its actions would be that millions of individuals would become addicted to opioids and other drugs, which in turn would destroy countless families and communities across the nation and in Florida, while imposing tremendous medical and other costs that would be borne by all purchasers of health insurance.

68.    Despite this knowledge, Anda engaged in the conduct described herein for the purpose of obtaining billions of dollars in windfall profits, while destroying the lives of countless Floridians.

## V.    FACTS SPECIFIC TO PLAINTIFF

69.    Plaintiff Farhan F. Khan is a natural person and resident and citizen of the State of Florida.

70.    Plaintiff is self-insured through the Federally Facilitated Marketplace, paying the entirety of his monthly insurance premiums himself.

## VI.    CLASS ALLEGATIONS

71.    This lawsuit is brought on behalf of the ascertainable Florida-only class defined above.

72.     This action has been brought and may properly be maintained as a class action pursuant to Florida Rule of Civil Procedure 1.220 and the case law construing that statute.

73.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, such information can be ascertained through appropriate discovery that seeks records relevant to the purchase and maintenance of health insurance. The members of the Class may also be notified of the pendency of this action by public notice, mailed notice, or e-mailed notice.

74.     There is a well-defined community of interest in the questions of law and fact affecting the parties represented in this action.

75.     Common questions of law and fact exist as to all members of the Class. These common questions predominate over the questions affecting only individual members of the Class.

76.     Among the questions of law and fact common to the Class are:

•       whether Anda was negligent in the distribution of its products;

•       whether Anda acted in violation of Florida law;

•       whether the Class is entitled to restitution and/or disgorgement, in addition to, or as a substitute for, damages under Florida law; and

•       whether Plaintiff is entitled to damages and/or injunctive relief.

77.     Plaintiff's claims are typical of those of the other Class members because Plaintiff, like every other Class member, paid for health insurance that was delivered in the state of Florida pursuant to Florida law, the premiums for which were increased as a result of Anda's misconduct described herein.

78.     Plaintiff can fairly and adequately represent the interests of the Class, has no conflict of interest with other Class members, is subject to no unique defense, and has retained counsel competent and experienced in the prosecution of class actions.

79.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable, the likelihood

of individual Class members prosecuting separate claims is remote, and individual Class members do not have a significant interest in individually controlling the prosecution of separate actions. Relief concerning Plaintiff's rights under the law alleged herein and with respect to the Class as a whole would be appropriate. Plaintiff knows of no difficulty to be encountered in the management of this action that precludes its maintenance as a class action.

80.      Plaintiff explicitly reserves the right to add additional class representatives, provided that Anda is given an opportunity to conduct discovery on the chosen representative.

## VII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### (Violations of Florida's Deceptive and Unfair

### Trade Practices Act (FDUTPA), §§ 501.201-.213)

81.      Plaintiff restates and realleges paragraphs 1 through 80 as if fully set forth herein.

82.      Plaintiff brings this Count on behalf of all members of the Class who are or have been residents of Florida at any relevant time.

83.      Plaintiff is a "consumer" as defined by Florida Statute § 501.203(7), and the subject transaction is "trade or commerce" as defined by Florida Statute § 501.203(8).

84.      FDUPTA was enacted to protect the consuming public and legitimate business enterprises from those who engage in unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce, and in unfair methods of competition.

85.      The Florida Deceptive and Unfair Trade Practices Act is intended to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."

86.      Anda's business practices as described in this Complaint are deceptive, unconscionable, unfair, and violate Florida law because the practices deceived doctors, insurers, and consumers in Florida, led to the sale of opioids that should not have been sold, and thereby caused Plaintiff and Class Members to pay higher insurance premiums.

87.     Anda was in the position to implement effective business practices to guard against diversion of the highly-addictive opioid products it sells and distributes. Instead, it profited off the opioid epidemic by flouting anti-diversion laws, while burdening Florida consumers by its conduct and profiting from the sale of prescription opioids in quantities that far exceeded the number of prescriptions that could reasonably have been used for legitimate medical purposes, despite having notice or actual knowledge of widespread opioid diversion from prescribing records, pharmacy orders, filed reports, and sales representatives.

88.     Anda's conduct constitutes an unlawful, fraudulent, and deceptive business practice. Moreover, Anda's acts in violation of law are also unconscionable business practices that constitute independent violations of the FDUTPA, including Anda's filling of suspicious or invalid orders for prescription opioids at both the wholesale and retail level; failing to maintain effective controls against opioid diversion; failing to operate an effective system to disclose suspicious orders of controlled substances; failing to report suspicious orders of controlled substances; failing to reasonably maintain necessary records of opioid transactions; and deliberately ignoring questionable and/or obviously invalid prescriptions and filling them anyway—all while purporting to have world-class and compliant systems, controls, and practices.

89.     Anda's fraudulent, unlawful and/or deceptive activity alleged herein caused insurers to pay for ineffective and dangerous treatments, as well as the increased costs associated with opioid addiction. Those costs were passed on to Plaintiff and members of the Class in the form of increased insurance premiums.

90.     As a direct and proximate result of the foregoing acts and practices, Anda has received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in the violations described in this Complaint.

91.     As a direct and proximate result of Anda's unconscionable, unfair, and deceptive acts or practices alleged herein, Plaintiff has been damaged and is entitled to recover actual damages, to the extent permitted by law, including Florida Statute § 501.211, in an amount to be

proven at trial. In addition, pursuant to Florida Statute § 501.211, Plaintiff seeks equitable relief and to enjoin Defendants on terms the Court considers reasonable. Plaintiff also seeks reasonable attorneys' fees and costs, as well as statutory damages as prescribed by Florida Statute §§ 501.211(2) and 501.2075.

## SECOND CAUSE OF ACTION

### (Unjust Enrichment)

92.     Plaintiff restates and realleges paragraphs 1 through 80 as if fully set forth herein.

93.     To the detriment of Plaintiff and Class members, Anda has been, and continues to be, unjustly enriched as a result of the unlawful and/or wrongful conduct alleged herein.

94.     Anda has voluntarily accepted and retained inflated prices paid for distributing opioid products with full knowledge that they were not lawfully entitled to it.

95.     Plaintiff and Class members bear the costs of the benefits conveyed to Anda in the form of increased insurance premiums.

96.     Between Anda and Plaintiff/Class members, it would be unjust for Anda to retain the benefits attained by its wrongful actions.

97.     Anda has been unjustly enriched, in the form of inflated prices, at the expense of Plaintiff and Class members who are entitled in equity to disgorgement and restitution of Anda's wrongful profits, revenue, and benefits, to the extent, and in the amount deemed appropriate by the Court, and any other relief the Court deems just and proper to remedy Anda's unjust enrichment.

## THIRD CAUSE OF ACTION

### (Negligence)

98.     Plaintiff restates and realleges paragraphs 1 through 80 as if fully set forth herein.

99.     Anda has a duty to exercise reasonable care in manufacturing and distributing highly dangerous medications in the State of Florida.

100.     Anda owes that duty to Plaintiff and Class members. Anda's profits as a

distributor are inextricably bound with the industry of health insurance, and any reasonably prudent distributor is aware of the basic mechanics of the insurance industry by which costs are passed on to others in a risk pool through premiums.

101.    Anda knew and should have known that allowing diversion of opioids would cause significant costs to consumers, insurers, and insurance customers.

102.    Anda breached its duty to Plaintiff and Class members through its false and misleading promotion of opioids and its deceptive marketing scheme, misrepresenting the nature of the drugs and aggressively promoting them for chronic pain.

103.    Anda breached its duty to Plaintiff and Class members to conform its behavior to the legal standard of reasonable conduct under the circumstances, in the light of the apparent risks, as well as through its failure to comply with Florida and federal laws protecting against diversion of controlled substances.

104.    Anda's conduct caused opioids to become widely available and widely used, and Anda's actions were, at the very least, a substantial factor in the widespread abuse of opioids. Without Anda's actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

105.    As described above, Anda's breach caused and proximately caused damages to Plaintiff and Class members.

## FOURTH CAUSE OF ACTION

### (Civil Conspiracy)

106.    Plaintiff restates and realleges paragraphs 1 through 80 as if fully set forth herein.

107.    Anda, in a scheme to improperly market and expand the sales of its opioid products, conspired with other drug distributors, manufacturers, and pharmacies to create the scenario where sales of its opioid products would lead to widespread opioid use, misuse, abuse, and addition, resulting in the opioid epidemic that now exists across the United States and in Florida.

108.    These sales occurred despite Anda's having actual or constructive knowledge that it was habitually breaching its common law and statutory duties.

109.    Anda would not have succeeding in profiting so significantly from the opioid epidemic without the concerted conduct of these other parties.

110.    As a result of the concerted action between Anda and other drug distributors, manufacturers, and pharmacies, Florida was continually violated by the provision of opioids through the supply chain.

111.    Anda formed an agreement with other drug distributors, manufacturers, and pharmacies to commit the aforementioned unlawful acts.

112.    Anda commissioned the aforementioned unlawful acts.

113.    The unlawful actions of Anda and other drug distributors, manufacturers, and pharmacies have resulted in extensive damages to Plaintiff and other Class members—in the form of increased health insurance premiums—for which Anda should be liable.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests, on behalf of himself and the Class, that this Court:

A.    Plaintiff, on behalf of himself and the Class, respectfully requests that this Court enter an Order:

B.    Declaring that the claims brought by Plaintiff may be maintained as a class action;

C.    Declaring that Anda has engaged in unlawful, unfair, and deceptive business acts and practices in violation of the FDUTPA;

D.    Ordering Anda to pay restitution of any money acquired by its unlawful, unfair, and deceptive business practices;

E.    Declaring that Anda has been unjustly enriched by its conduct;

F.    Ordering Anda to pay restitution of all benefits and disgorge all profits unjustly retained by Anda;

G.      Declaring that Anda has acted negligently;

H.      Ordering Anda to pay all damages caused to Plaintiff and Class members by its negligent actions;

I.      Declaring that Anda has engaged in a civil conspiracy to improperly market and expand the sales of their opioid products;

J.      Awarding all damages, including treble and punitive damages, to which Plaintiff and Class members are entitled;

K.      Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

L.      Awarding Plaintiff and the members of the Class their reasonable litigation expenses and attorneys' fees;

M.      Awarding Plaintiff and the members of the Class pre- and post-judgment interest, to the extent allowable; and

N.      Awarding such other and further relief as equity and justice may require.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff demands a jury trial for all claims so triable.


Respectfully submitted,

**FARHAN F. KHAN**, individually and on behalf of all others similarly situated,

Dated: September 13, 2019          By: /s/ John A. Yanchunis

John A. Yanchunis
jyanchinis@ForThePeople.com
Juan Martinez
juanmartinez@ForThePeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 North Franklin Street, 7th Floor
Tampa, Florida 33602
Tel: 813.223.5505

James Young
jyoung@ForThePeople.com
MORGAN & MORGAN

COMPLEX LITIGATION GROUP
76 South Laura Street, Suite 1100
Jacksonville, Florida 32202
Tel: 904.398.2722

Ashley Keller*
ack@kellerlenkner.com
Travis Lenkner*
tdl@kellerlenkner.com
Seth Meyer*
sam@kellerlenkner.com
KELLER LENKNER LLC
150 N. Riverside Plaza, Suite 4270
Chicago, Illinois 60606
Tel: 312.741.5220

William S. Consovoy*
will@consovoymccarthy.com
Thomas R. McCarthy*
tom@consovoymccarthy.com
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, Virginia 22209
Tel: 703.243.9423

*Pro Hac Vice admission to be sought

Counsel for Plaintiff and the Putative Class